UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| JANET RODGERS | CIVIL ACTION NO. 09-1487 |
| VERSUS | |
| | DISTRICT JUDGE DEE D. DRELL |
| HARTFORD LIFE and ACCIDENT INSURANCE COMPANY | U.S. MAGISTRATE JUDGE JAMES D. KIRK |

## REPORT AND RECOMMENDATION

This Employees Retirement Income Security Act ("ERISA") case, 29 U.S.C.1001 et seq., is referred to me by the district judge for Report and Recommendation.  The case is ready for decision on briefs on the merits in accordance with the ERISA Case Order [Doc. #23].

## Facts

Claimant, Janet Rodgers, worked as a nurse at Rapides Regional Medical Center for 19 years. She alleges she was injured when she lifted a patient in 1993, resulting in lumbar surgery. She underwent additional surgery on her low back in 1994 but returned to work in 1995 and worked until she was again injured in an automobile accident in 1997. That accident re-injured plaintiff's low back and caused new complaints of cervical pain. She began treatment with Dr. Thomas Perone and, on November 9, 1998 he found

her "permanently disabled from any and all occupations because of her back surgery and subsequent scarring."

Plaintiff filed a claim for disability benefits on March 17, 1997 with Hartford, the insurer and administrator of plaintiff's employer's disability plan. The claim was approved and plaintiff was paid short term and long term disability benefits of over $2600 per month up to October 17, 2008. On that date, and after a review by a physician and based on surveillance taken of plaintiff, Hartford notified plaintiff that benefits were being terminated because she no longer met the definition of disability contained in the employer's Plan.

In April 2009 claimant filed an appeal of the decision on her long term disability application. The company referred the claim to two additional physicians for review, an orthopedist and a rheumatologist. On June 16, 2009, Hartford advised plaintiff of the denial of her appeal. This suit for judicial review followed.

## <u>Standard of Review</u>

In accordance with this court's standing ERISA Case Order, the parties agree that the Group Long Term Disability Plan issued by defendant is an employee welfare benefit plan, as defined by the provisions of ERISA, and that this case is governed by ERISA and that all state law claims are preempted.  The parties also agree that the Plan provides the administrator with discretionary authority to interpret the provisions of the Plan and to make

findings of fact and determine eligibility for benefits.  Both
Claimant and Defendant agree that the administrative record is
complete. However, because the administrator is both insurer and
administrator and is thus conflicted, the court will consider the
conflict along with all other factors. Metropolitan Life Ins. Co.
v. Glenn, 128 S. Ct. 2343 (2008), Holland v. International Paper
Co., 576 F. 3d 240, 247-248 (5th Cir. 2009). See also, Vega v.
National Life Insurance Services, Inc., 188 F.3d 287, 299 (5th Cir.
1999).

## The Plan

The disability plan provides that an employee is disabled if
she is prevented by injury or sickness from performing the
essential duties of any occupation for which she is qualified by
education, training or experience. An employee is required to
provide continuing proof of disability.

## The Medical Records

Plaintiff's medical history, for present purposes, began when
she underwent a lumbar laminectomy in 1993 at L5-S1 following the
incident involving lifting a patient in her work as a nurse.
Additional lumbar surgery was performed in 1994, but plaintiff
returned to work and then was involved in an automobile accident in
March 1997 which aggravated her preexisting low back problems. She
then filed this application for disability benefits which were

3

awarded. Plaintiff saw Dr. Thomas Perone, the neurosurgeon who had

performed both of her prior lumbar surgeries, for evaluation.

Perone concluded that, due the "residuals of the prior surgeries"

and to an aggravation of the scar tissue resulting from the prior

surgeries, she was "permanently disabled from any and all

occupations". His opinion, according to his deposition taken at

that time, that his opinion was based on plaintiff's subjective

complaints of pain.

Thereafter, plaintiff was injured in automobile accidents in

June of 1999 and July of 2003. She then complained that her back

and neck pain had worsened and that she had paresthesia in her

arms. She was also diagnosed with fibromyalgia[1] by her treating

rheumatologist, Dr. Marshall, in early 2000. Marshall also

diagnosed cervical and lumbar spondylosis[2]. Dr. Perone's opinion at

---

[1] Fibromyalgia is an increasingly recognized chronic pain illness which is characterized by widespread musculoskeletal aches, pain and stiffness, soft tissue tenderness, general fatigue and sleep disturbances. The most common sites of pain include the neck, back, shoulders, pelvic girdle and hands, but any body part can be involved. Fibromyalgia patients experience a range of symptoms of varying intensities that wax and wane over time. To diagnose fibromyalgia, doctors must rely on patient histories, self-reported symptoms, a physical examination and an accurate manual tender point examination. It may take five years to obtain an accurate diagnosis which is made based on standardized criteria. The diagnosis requires a finding of widespread pain in all four quadrants of the body for a minimum duration of three months and tenderness in at least 11 of 18 trigger points. MedlinePlus.com, a service of the U.S. National Library of Medicine and the National Institute of Health.

The Fifth Circuit has described fibromyalgia as "an elusive but debilitating affliction" that "is characterized by complaints of generalized pain, poor sleep, and inability to concentrate, and chronic fatigue." Black v. Food Lion, Inc. 171 F.3d 308, 309 (5th C. 1999). Other courts have recognized the disease as well. See for example, Jusino v. Barnhard, 2002 WL 31371988 (E.D. Pa.).

[2] Spondylosis is a general term most often applied to the cervical spine for age related wear and tear (degeneration) affecting the intervertebral discs and bones of the neck. These

that time was that plaintiff could not perform light or medium work because of her post-operative scarring and resultant complaints of pain.

Rodgers continued to treat with Dr. Marshall, the rheumatologist. In 2002, his diagnosis was fibromyalgia, osteoarthritis, status post operative laminectomy of L5-S1 and carpal tunnel syndrome, among others. An MRI in 2002 showed degenerative disc changes and neuroforminal stenosis[3] at C5-6.

In 2003 Dr. Marshall again diagnosed "fibromyalgia as manifest by multiple symmetrical tender points and various other symptoms." He also found osteoarthritis and cervical radiculopathy. Plaintiff was continued on medications and he referred her for physical therapy for cervical radiculopathy. Carpal tunnel was also again diagnosed.

In September 2003 plaintiff still complained of neck pain with radiation into the left shoulder. Another MRI showed a broad-based C5-6 disc bulge with osteophyte formation. The MRI also showed a mild degree of left C4-5 foraminal stenosis. No disc herniations were shown. In October Marshall diagnosed neck pain with mild

---

changes contribute to the development of osteoarthritis in the neck or low back joints. Common symptoms are neck pain, stiffness and loss of sensation in the shoulders, arms or legs. MedlinePlus.com, a service of the U.S. National Library of Medicine and the National Institute of Health.

[3] Neuroforaminal stenosis is a narrowing of the nerve root opening in the vertebrae where the nerve roots exit the spinal column.. MedlinePlus.com, a service of the U.S. National Library of Medicine and the National Institute of Health.

radiculopathy improving with conservative treatment and pain relievers. He again discussed with plaintiff physical therapy. Plaintiff chose not to participate in physical therapy. Marshall also changed her prescription for the fibromyalgia.

In October 2004, Dr. Marshall decided to refer plaintiff to Dr. Nanda in Shreveport. Marshall was still not sure whether plaintiff's complaints in her arms were due to radiculopathy or to carpal tunnel syndrome.

In February 2005 plaintiff continued to complain of paresthesias and global musculoskeletal pain and persistent back pain. In July she still had not gone to see Dr. Nanda. Her complaints and the diagnoses remained essentially unchanged.

In March 2006 her complaints, findings and diagnoses were, for the most part, unchanged.

In December 2006 another MRI showed cervical spondylosis at various levels with no evidence of disc herniations. The radiologist noted increased or additional spondylotic changes as compared to the September 2003 films.

In February, 2007, Dr. Marshall referred plaintiff to Dr. Allen Joseph, one of Dr. Perone's partners, regarding her neurosurgical complaints. Dr. Joseph found that plaintiff's most recent cervical MRI showed a prominent disc at C5-6. EMG/NCV studies neither confirmed nor ruled out a diagnosis of radiculopathy. He recommended a repeat EMG/NCV study or myelogram.

6

He also found that her "neurologic examination is objectively normal but does raise the possibility of a C6 injury problem." Dr. Joseph also noted "there is something about this patient that suggests that further surgical intervention will have a hard time being successful."

Later in 2007 Hartford obtained surveillance on plaintiff.

Lower lumbar spine films in September 2007 showed degenerative disc disease and facet arthropathy in the lower lumbar spine.

In September 2008 the claim was referred by Hartford to Dr. Burns. He reviewed the medical records and the surveillance films. He noted that the surveillance showed that plaintiff was able to carry a dog and get into and out of an SUV and manipulate the steering wheel. She could drive, shop and hold a grocery bag. She had spent about 10 ½ hours at a dog show walking, holding a dog, turning, twisting, bending, lifting, squatting and reaching without impairment.

Dr. Burns found that plaintiff's level of function was normal as of November 2007 and that she could perform medium work. he found the limitations on function claimed by plaintiff were not supported. He noted that plaintiff had good endurance and that she engaged in extended physical activities without impairment. She also used her hands for hours at a time without a problem.

In summary, Dr. Burns opined that plaintiff had no restrictions or limitations for sedentary or light or medium work.

Days later, Dr. Marshall reported that he sees plaintiff primarily for fibromyalgia complaints but that she also has significant spondylosis. He specifically noted that plaintiff has the requisite number of tender points required for a diagnosis of fibromyalgia. She was still on multiple medications. He stated that he encourages his patients to be as active as possible even though it may require additional medication.

In summary, Dr. Marshall stated that

". . . due to persistent joint pain, stiffness and fatigue, Rodgers is unable to conduct sustained physical activity. I feel it is my opinion that if forced into an employment situation, persistent musculoskeletal symptoms and fatigue will result in decreased capability to perform necessary duties, and I expect it would also result in excessive absenteeism. Based on my experience with fibromyalgia syndrome, although there is no instrument for measuring physical disability, it is my opinion that Ms. Rodgers is medically disabled from participation in gainful employment."

Dr. Burns then opined that Dr. Marshall's report did not change the functionality as stated in Burns' previous report. He felt that the level of activity demonstrated in the surveillance videos "showed a level of sustained function that would indicate that the claimant can perform medium level work."

8

An Employability Analysis Report found jobs claimant could perform based on Burns' opinions. Plaintiff's disability benefits were terminated as of October 18, 2008 because she was able to perform the duties of "any occupation".

On October 16, 2008 plaintiff was involved in yet another automobile accident, this time a rear end accident. She saw Dr. Vaughn, a neurosurgeon, in December of that year. He noted her prior history of surgeries on the low back, her complaints of back and neck pain and her diagnosis of fibromyalgia. He recommended an MRI.

The MRI was performed on December 29, 2008 and Vaughn reported that it showed mild to moderate cervical spinal stenosis with severe left greater than right neuroforaminal stenosis and severe degenerative disc disease and spondylosis at the C5-6 vertebral level. Minimal neuroforaminal stenosis was seen also at C4-5. Lumbar films showed moderate to severe disc degeneration at L5-S1.

Based on his examination and the films, Dr. Vaughn recommended an anterior cervical discectomy and fusion at C5-6 which was performed on January 27, 2009. He diagnosed "probable carpal tunnel syndrome" and fibromyalgia, based on history. Dr. Vaughn later stated that plaintiff was disabled from the point of the accident through recovery. He also believed that, while the combination of fibromyalgia and post surgical cervical injury would cause significant impairment of Rodgers' ability to work in a full time

9

position, she would be capable "at best, of working in a sedentary to light position provided she had frequent work breaks and allowed to alternate positions." Dr. Vaughn's opinion excluded any consideration of the effect of Rodgers' lumbar injuries which he had not assessed.

After the appeal, Hartford referred the claim to Dr. Fiedor, an orthopedist, and Dr. Payne, a rheumatologist. Dr. Fiedor made an exhaustive review of the medical records and compiled an in-depth summary of the records. See AR51-63. Fiedor also reviewed the surveillance reports and video. Fiedor found that there were no significant changes in claimant's condition until the October 16, 2008 accident. As of that date, Fiedor felt that claimant could have performed sedentary work (with the exception of the recovery period following surgery) and continuing in the future.

Dr. Payne, the rheumatologist, noted there were only minimal examination findings in the record. He found no evidence of any rheumatic disease that would be expected to produce restrictions or limitations on activities. He found her capable of full time light work.

Hartford notified plaintiff that her appeal was denied on June 16, 2009.

10

## Review for Abuse of Discretion

Rodgers does not contest the administrator's interpretation of the Plan. See Wildbur v. ARCO Chem. Co., 974 F.2d 631 (5th Cir. 1992). Rather, claimant, through counsel, argues that there does not exist in the record substantial evidence to support the decision of the administrator and that the company placed too much emphasis on the opinions of its own consulting physicians and the surveillance as opposed to plaintiff's treating doctors.

Eligibility for benefits under any ERISA plan is governed by the plain meaning of the plan language. Threadgill v. Prudential Securities Group, Inc., 145 F.3d 286 (5th Cir. 1998). In determining whether an administrator abused its discretion, we look to whether that administrator was arbitrary or capricious. "An administrator's decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial." Lain v. UNUM Life Ins. Co. of America, 279 F.3d 337, 342 (5th Cir. 2002). There must be "concrete evidence" in the administrative record that supports the denial of the claim. Id. The administrator's decision should be reversed only if it is arbitrary or capricious, that is, if the record lacks substantial evidence to support the Plan Administrator's benefit determination. See Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc., 168 F.3d

211, 215 (5th Cir. 1999).  See also <u>Vega v. Nat'l Life Ins. Servs.</u>, 188 F.3d 287, 299 (5th Cir. 1999).

      The initial denial and the denial of reconsideration on appeal were  expressly based on a finding that the medical data does not support that Ms. Rodgers' medical situation would prevent her from performing  full  time  work.  Such  a  basis  for  a  disability determination may constitute "substantial evidence" or "concrete evidence". See <u>Mouton v. Fresenius Medical Care of North</u>, 2003 WL 22287522 (5th Cir. 2003), <u>Dubose v. Prudential</u>, 2003 WL 23021934 (5th Cir. 2003)(unpublished), <u>Chandler v. Hartford</u>, 2006 WL 1209363 (5th Cir. 2006)(unpublished),<u>Ruiz v. Continental Casualty Co.</u>, 400 F.3d 986 (7th Cir. 2005), <u>Johnson v. Metropolitan</u>, 437 F.3d 809 (8th Cir. 2006), <u>Wangenstein v. Equifax, Inc.</u>, 2006 WL 2220822 (11th Cir. 2006)(unpublished). That determination, that the record does not support plaintiff's inability to perform "any occupation" is correct and   is supported by substantial and concrete evidence.

      Plaintiff argues that Hartford should not have relied on the opinions of its consultants when plaintiff's own doctors' opinions were contrary. However, the administrator is not required to give special deference to the treating physicians when confronted with contrary reliable evidence, <u>see Black & Decker Disability Plan v. Nord</u>, 123 S.Ct. 1965 (2003); <u>Love v. Dell, Inc.</u>, 551 F.3d 333 (5th C. 2008). Stated another way, ERISA does not require the opinions of  treating  physicians  to  be  preferred  over  those  of  other

physicians reviewing a file; ERISA merely requires that the opinions of treating physicians, as with all evidence submitted by the claimant, actually be taken into account in an administrator's determination. Love v. Dell, Inc., supra.

Although plaintiff points to the opinions of the treating physicians as showing that plaintiff is disabled, those opinions are only minimally helpful, for the doctors do not provide exactly what limitations or restrictions plaintiff has that might prevent her from working.

Ordinarily the physicians should provide opinions as to limitations and restrictions from a medical standpoint as they are trained to do.  An expert with particular expertise regarding vocational options--ordinarily a vocational rehabilitation expert-- takes those limitations and restrictions and determines if there is "any occupation" that plaintiff can perform consistent with those restrictions and limitations. Here the doctors failed to do that. The reviewing physicians found no restrictions or limitations preventing plaintiff from working at at least sedentary work.

## Conclusion

The medical evidence in the case shows that plaintiff has a long medical history involving accidents and several surgeries together with numerous subjective complaints of pain. However, despite plaintiff's multiple diagnoses, there is substantial and

concrete evidence that plaintiff could work, as of the date her benefits were terminated.

For the foregoing reasons, the Court finds, after reviewing the record and considering defendant's dual role as insurer and plan administrator, that the decision of the administrator is supported by substantial and concrete evidence and is neither arbitrary nor capricious nor an abuse of discretion.

IT IS RECOMMENDED that plaintiff's appeal be DENIED and the case dismissed.

## <u>OBJECTIONS</u>

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the clerk of court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the district judge at the time of filing.  Timely objections will be considered by the district judge before he makes his final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM**

14

**ATTACKING ON APPEAL THE UN-OBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, in Alexandria, Louisiana, on this 9th day of August, 2010.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE

15